IN THE UNITED STATES DISTRICT COURT
FOR WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:18 CR 142

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | MEMORANDUM AND |
| ) | RECOMMENDATION |
| DAVID JOE GARCIA, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

This matter is before the Court on Defendant's Motion to Suppress (Doc. 8), which has been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B). Having carefully reviewed the evidence, the parties' arguments, and applicable authorities, the undersigned respectfully recommends that the Motion be denied.

I. Relevant Procedural Background

On December 4, 2018, Defendant was charged in a single-count indictment with the possession of firearms and ammunition by a person who had previously been convicted of a crime punishable for a term exceeding one year. (Doc. 1).

On December 12, 2018, Defendant made an initial appearance during which counsel was appointed for him. An arraignment was also conducted, and Defendant entered a plea of not guilty. The Government moved for pretrial detention, and Defendant waived a hearing on that motion.

On January 9, 2019, Defendant filed the instant Motion to Suppress (Doc. 8) and a supporting brief (Doc. 9). The Government filed a response in opposition (Doc. 11).

On February 14, 2019, the undersigned conducted an evidentiary hearing on the Motion. Assistant United States Attorney John Pritchard appeared for the Government. Fredilyn Sison and Melissa Baldwin of the Federal Defender's Office appeared with Defendant.

Post-hearing submissions included a Supplemental Brief from Defendant (Doc. 15) and a response from the Government (Doc. 17). A motion by Defendant for leave to file a reply was denied. (Docs. 18, 19).

## II. Summary of the Evidence

### A. The Government's Evidence

The Government called four witnesses: Jordan Warren, Trenton Turpin, Greg Connor, and Mark Gage. The Government also presented maps of the subject area, an order for Defendant's arrest for failure to appear, a motor vehicle inventory form, a waiver of rights form, and a video from the dashboard camera of Sgt. Warren's patrol car.

#### 1. Surveillance

In the early morning hours of July 23, 2018, Jordan Warren, a patrol sergeant with the Henderson County Sheriff's Office, was watching the area around Asheville Highway and Wickins Drive due to a history of narcotics

2

activity. (6-7, 10-11, 58.) There was little traffic. (61-62.)

Sgt. Warren's marked patrol car was parked, with its lights on, in the parking lot of a fire department adjacent to Asheville Highway. (7, 11.) At approximately 2:30 a.m., he observed a 2012 Nissan Sentra approach a stop sign at the intersection of two secondary roads approximately one block away. (7, 11, 12, 58, 71.) The vehicle remained at the stop sign for three to five seconds, which seemed unusual to Sgt. Warren as there was no cross traffic or obstruction. (13, 58.)

Then, instead of proceeding straight through the intersection, and toward Sgt. Warren's location, the vehicle turned right onto another secondary road. (13.) Sgt. Warren thought the driver might be attempting to avoid him and planning to enter Asheville Highway (the main road) at a different location. (13-14.) Sgt. Warren drove to intercept the vehicle and located it as it was heading toward Asheville Highway. (14.) He turned around and began following the vehicle. (17-18.)

Sgt. Warren ran the vehicle's license tag and was informed that Defendant's mother was the registered owner. (17, 61.) The computer program Sgt. Warren was using also returned indicators for "narcotics, felon, and drugs." (18.)

### 2. Traffic Stop and Arrest of Defendant

Sgt. Warren continued following the vehicle, which ultimately turned on

3

to Brookside Camp Road, a two-lane road. (19 – 20, 62.) At one point, the vehicle swerved out of its lane, crossing the double yellow line, and then returned immediately to its original lane of travel. (27, 62.)

Sgt. Warren activated the lights on his patrol car and initiated a traffic stop. (27-28.) He approached the vehicle and observed that Defendant was the lone occupant. (28.) Sgt. Warren advised Defendant of the basis for the stop, and Defendant responded that he left his lane of travel because he was concerned about damaging new, low-profile suspensions or rims on the vehicle. (28, 64.) Defendant also stated he was going to a friend's place because he had received a call that her ex-boyfriend was there harassing her and damaging property. (36.) Defendant produced an identification card but did not have a driver's license. (28 – 29.)

Sgt. Warren returned to his patrol car to confirm Defendant's driving status. (29.) He learned that Defendant's North Carolina driver's license had been revoked and that Defendant was on federal supervised release. (29-31, 67.) He called for a back-up officer, and Deputy Trenton Turpin responded, parking behind Sgt. Warren's patrol car. (125, 128.)

Sgt. Warren directed Defendant to exit the vehicle and advised Defendant that he did not have a valid driver's license and that a warrant was outstanding for Defendant's failure to appear for a prior "driving while license revoked" charge. (34, 47.) Defendant stated that his supervised release was

4

based on firearms convictions. (Gov's Ex. 8.) Sgt. Warren asked Defendant if he would consent to a search of the car, and Defendant refused. (75.)

Sgt. Warren directed Defendant to place his hands behind his back and felt what appeared to be a ballistic vest under Defendant's jacket. (34-35.) He asked Defendant about the vest, and Defendant stated that it was a paintball vest. (35.) Sgt. Warren, however, testified that the vest was a tactical vest of the type used by law enforcement or special response teams and was capable of carrying a ballistic plate. (35.) Although Defendant's vest did not have a ballistic plate, it could still provide some degree of protection. (35.)

A Bowie style knife was located on Defendant's right side and two sets of brass knuckles were found in his pants pockets. (35-36, 126.) Defendant was told he was under arrest for the outstanding warrant, was handcuffed, and was placed in the back seat of Sgt. Warren's patrol car. (37.)

### 3. Search of the Car

Sgt. Warren asked Defendant if there was anything in the vehicle, and advised him that he was carrying two concealed weapons and that there would be a search of the vehicle. (36.) Sgt. Warren testified that he had initially intended to perform an inventory search of the car, but once the brass knuckles were located, it became a probable cause search for additional weapons. (37-38.)

A search of the vehicle was then performed by Sgt. Warren and Deputy

Turpin. (75, 77, 126.) By shortly after 3:00 a.m., a holstered weapon had been located under the console of the steering wheel to the left of the brake pedal. (48 – 50.)

During the search, Defendant remained in the back seat of Sgt. Warren's patrol car. At various times, Sgt. Warren returned to his patrol car to speak to Defendant. (97.)

At approximately 3:32 a.m., Sgt. Warren approached his patrol car, though did not ask any questions of Defendant. (53.) Nonetheless, Defendant told him there was a shotgun in the trunk of the vehicle. (53 – 54). Sgt. Warren relayed this information to Deputy Turpin, who indicated the shotgun had already been located. (54).

Prior to his arrest, Defendant had used his cell phone to call his girlfriend, who came to the scene. While she was there, she and Defendant spoke quietly, and Sgt. Warren and Deputy Turpin heard Defendant tell her that the firearms had been found. (56 – 57; 94, 129, 134).

Items ultimately seized from the vehicle or Defendant included: a 9 MM handgun (from the driver's area), a shotgun (from the trunk), a mask, a body armor vest, a shoulder and a pistol magazine holder, a 7 inch Kabar knife, a pistol holster, a Smith and Wesson asp, two sets of brass knuckles, and various 9mm and 12 gauge shells. (48, 85, 90, 91, 101, 102, 126, 127, Def.'s Ex. 1.)

Sgt. Warren later called a tow truck for the car. (93.) Defendant was

not given Miranda warnings during the encounter and was not charged with possessing the brass knuckles. (98, 103.)

### 4. Interview

On July 24, 2018, Mark Gage, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), attempted to interview Defendant at the Henderson County Sheriff's Office. (135-36.) Defendant was advised of his rights and signed an ATF waiver of rights form. (137.) Initially, Defendant stated that the two firearms came from "Alfred Blair," though later admitted he made the story up. (139.) Defendant eventually requested a lawyer, and the interview ended. (139.)

### 5. Roadway Supervisor Connor

Greg Connor is the Henderson County maintenance supervisor tasked with maintaining the highways of Henderson County and is familiar with Brookside Camp Road. (110.)

In July of 2018, Connor discovered a depression in the area of Brookside Camp Road in question, which he determined was caused by a failing pipe under the road. He therefore had a "smoothing" asphalt patch installed. (112.) The patch, which was in place on July 23, 2018, covered the lane completely from the fog line to the yellow line but did not impede traffic. (111-113.) The pipe was later replaced in November of 2018. (111-112, 114.) During the time the patch was in place, Connor ensured that the road was safe for travel, and

7

he received no complaints about the patch. (111, 120, 121, 122.)

### B. Summary of Defendant's Evidence

Defendant did not offer testimonial evidence in support of his Motion to Suppress, but was allowed to offer a document detailing the property seized from Defendant's person and vehicle without objection.

## III. Legal Principles

### A. Burden of Proof

Generally, a defendant seeking to suppress evidence bears the burden of proof. See United States v. Dickerson, 655 F.2d 559, 561 (4th Cir. 1981). "Once the defendant establishes a basis for his motion to suppress, the burden shifts to the government to prove by a preponderance of the evidence that the challenged evidence is admissible." United States v. Vanover, No. 1:15 CR 97-MOC-DLH, 2016 WL 2943818, at *6 (W.D.N.C. May 20, 2016) (citing Colorado v. Connelly, 479 U.S. 157, 168 (1986)); United States v. Gualtero, 62 F. Supp. 3d 479, 482 (E.D. Va. 2014) (citing United States v. Matlock, 415 U.S. 164, 177 n.14 (1974)).

### B. Findings of Fact

Findings of fact may be made by a district court when deciding a motion to suppress. See United States v. Stevenson, 396 F.3d 538, 541 (4th Cir. 2005). "When material facts that affect the resolution of a motion to suppress . . . are in conflict, the appropriate way to resolve the conflict is by holding an

evidentiary hearing after which the district court will be in a position to make findings." United States v. Taylor, 13 F.3d 786, 789 (4th Cir.1994). In doing so, the court determines "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence." Gualtero, 62 F. Supp. 3d at 482 (citing United States v. McKneely, 6 F.3d 1447, 1452-53 (10th Cir. 1993)). Apart from testimonial privileges, the Federal Rules of Evidence do not apply at suppression hearings. United States v. Sowards, 690 F.3d 583, 589 at n. 5 (4th Cir. 2012) (citing United States v. Schaefer, 87 F.3d 562, 570 (1st Cir.1996)).

## IV. Discussion

Defendant makes the following arguments: 1) that Sgt. Warren did not have a legal basis for conducting a traffic stop; 2) that Defendant's possession of brass knuckles did not justify a warrantless search of his mother's car; 3) that Defendant's Fifth Amendment right against self-incrimination was violated; and, 4) that all of the evidence seized subsequent to the constitutional violations should be suppressed. Def.'s Mem. (Doc. 9) at 4-8; Def.'s Supp. Br. (Doc. 15) at 1-5.

### A. The Traffic Stop

Defendant contends that his act of leaving his lane of travel was appropriate because there was a "dip" in his lane, and he wanted to avoid damage to new, low-profile rims or suspension components on the car. Def.'s

9

Mem. (Doc. 9) at 5.

North Carolina law directs that "[u]pon all highways of sufficient width a vehicle shall be driven upon the right half of the highway." N.C. Gen. Stat. § 20-146(a). An exception is made "[w]hen an obstruction exists making it necessary to drive to the left of the center of the highway." Id. § 20-146(a)(2).

The undersigned is not persuaded, however, that the asphalt patch on Brookside Camp Road the night of Defendant's arrest should be considered an "obstruction" for purposes of this statute. Highway maintenance supervisor Connor testified that he was familiar with the patch, that it did not endanger traffic, and that no complaints regarding the patch were received while it was in place. Connor was an objective witness, and the undersigned finds his testimony to be persuasive. In addition, Sgt. Warren drove his patrol car over the patch immediately after Defendant swerved to avoid it, and the patch in no way impeded or adversely affected the movement of Sgt. Warren's patrol car.[1]

Consequently, the stop of the vehicle Defendant was driving was reasonable. See Whren v. United States, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where police have probable cause to believe that a traffic violation has occurred.").

---

[1] No evidence was presented that Defendant's vehicle was actually equipped with low-profile rims or suspension equipment.

B.   Search of the Vehicle

Initially, Defendant did not challenge the propriety of the search of the vehicle. See Def.'s Mot. (Doc. 8) at 4 ("Although the search was conducted for inventory, Mr. Garcia should not have been stopped in the first place."). The Court did, though, allow supplemental briefing on this issue following the evidentiary hearing.

Defendant's argument in this regard is that his possession of brass knuckles did not justify a warrantless search of his mother's car. Def.'s Supp. Br. (Doc. 15) at 1-5.

The automobile exception allows law enforcement to search a vehicle without first obtaining a warrant when the vehicle "'is readily mobile and probable cause exists to believe it contains contraband' or evidence of criminal activity." United States v. Baker, 719 F.3d 313, 319 (4th Cir. 2013) (quoting Pennsylvania v. Labron, 518 U.S. 938, 940 (1996)). This standard is satisfied when a police officer lawfully searches a vehicle's recent occupant and finds contraband on his person. Id. at 319.

> "[P]robable cause is a flexible, common-sense standard." Texas v. Brown, 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (plurality opinion). It is a "fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

11

United States v. Watts, No. 1:18 CR 42-MR-DLH, 2018 WL 4610657, at *9 (W.D.N.C. Sept. 4, 2018), report and recommendation adopted, 2018 WL 4604027 (Sept. 25, 2018).

Since probable cause is an objective test, courts are instructed to "examine the facts within the knowledge of arresting officers to determine whether they provide a probability on which reasonable and prudent persons would act; [courts] do not examine the subjective beliefs of the arresting officers to determine whether *they* thought that the facts constituted probable cause." United States v. Gray, 137 F.3d 765, 769–70 (4th Cir. 1998) (emphasis in original).

North Carolina law prohibits the intentional carrying of concealed weapons, including metallic knuckles, except when a person is on his or her own premises. N.C. Gen. Stat. § 14-269(a); see also State v. Bollinger, 665 S.E.2d 136, 140 (N.C. Ct. App. 2008).

Here, Defendant's argument focuses solely on the presence of the brass knuckles. However, the question is not whether the discovery of the brass knuckles, standing alone, supported a probable cause search of Defendant's vehicle, even if Sgt. Warren, as his testimony showed, believed that it did. As the above-referenced authorities indicate, the existence of probable cause hinges not on the subjective beliefs of an individual officer or on a single fact, but on whether the facts known to arresting officers provide a probability on

which reasonable and prudent persons would act.

In addition to the presence of the brass knuckles, the facts known by Sgt. Warren and Deputy Turpin included that the encounter was occurring in the early hours of the morning, that Defendant had driven in such a way to suggest he may have been attempting to avoid traveling near Sgt. Warren's parked patrol car, that a fixed blade knife and a tactical ballistic vest were found on Defendant's person, that a mask and a baton were seen in plain view in the vehicle (102), that Defendant was on supervised release for previous firearms convictions, and that Defendant had advised he was on his way to assist his friend whose ex-boyfriend was creating a disturbance.

These circumstances were sufficient to create probable cause for a search of Defendant's vehicle.[2] See United States v. Brown, No. 09-145(JNE/RLE), 2009 WL 2982934, at *11 (D. Minn. Sept. 14, 2009), aff'd. 653 F.3d 656 (8th Cir. 2011) ("Moreover, based upon his legal discovery of the knife, and the brass knuckles, we conclude that [the officer] had probable cause to search the vehicle, even without a warrant.").

---

[2] Defendant's post-hearing brief also argues that the search was invalid as an inventory search. Def.'s Supp. Br. (Doc. 15) at 5 n.3. The undersigned has not addressed this argument since the evidence indicated that though Sgt. Warren initially planned to conduct an inventory search, the search was actually performed as a probable cause search. (37-38.)

13

C.   **Custodial Interrogation**

Defendant next argues that his Fifth Amendment right against self-incrimination was violated. Def.'s Mem. (Doc. 9) at 5-7.  Specifically, Defendant contends that he was in custody, was not advised of his Miranda rights, and was unlawfully questioned about contraband found in the car.  Id. at 7.

The Fifth Amendment ensures that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V; United States v. Nielsen, 640 F. App'x 224, 227 (4th Cir. 2016).  This right has been construed to require that, when a suspect is subjected to "custodial interrogation," he must be warned that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Miranda v. Arizona, 384 U.S. 436, 444 (1966).

The Fourth Circuit has held that "routine traffic stops are not custodial and therefore do not require Miranda warnings." United States v. Jackson, 280 F.3d 403, 405 (4th Cir. 2002) (citation omitted). "Only if the motorist is detained to a degree associated with formal arrest will he be entitled to the Miranda protections for in-custody interrogations." United States v. Sullivan, 138 F.3d 126, 130 (4th Cir. 1998) (internal quotation marks omitted).

"[T]he test for determining whether a suspect was subjected to

14

interrogation is whether a reasonable objective observer would believe an officer's express questioning [was] likely to elicit an incriminating response." United States v. Bell, 901 F.3d 455, 476 (4th Cir. 2018) (quoting United States v. Johnson, 680 F.3d 966, 976 (7th Cir. 2012), overruled on other grounds by Fowler v. Butts, 829 F.3d 788 (7th Cir. 2016)). When making such a determination, "[t]he focus is on the suspect's perceptions" and not the intent of law enforcement. Id. (quoting Johnson, 680 F.3d at 976) (emphasis omitted).

In this case, immediately after the stop, Sgt. Warren had an initial exchange with Defendant, investigated Defendant's license status, and had brief follow up communication with him. The encounter at this stage was a routine traffic stop for which Miranda warnings were not required.

It is undisputed that Defendant was placed in custody at that point - he was arrested, handcuffed, and placed in the back seat of Sgt. Warren's patrol car. Notwithstanding his custodial status, Defendant did not receive Miranda warnings.

With regard to whether Defendant was "interrogated" while he was in custody, in his Memorandum supporting the Motion, Defendant states that Sgt. Warren, upon finding contraband, "asked Mr. Garcia about the items found." Def.'s Mem. (Doc. 9) at 7. Similarly, during the hearing, Defendant argued that Sgt. Warren asked "numerous questions" to Defendant while he was in custody. (166.)

15

However, the only specific question Defendant has identified is "what do you have in the car? We are going to find it anyhow so you better tell us now." (166.)[3]

In addition, Defendant has not identified any specific statements he made in response to Sgt. Warren's questions and that he now argues should be suppressed.[4] Even viewing the evidence without the benefit of specific references in this regard, it does not appear that Defendant, while in custody, provided substantive (if any) answers to questions asked by Sgt. Warren.[5]

Therefore, Defendant has failed to carry his burden of identifying a self-incriminating statement allegedly obtained in violation of his Miranda rights. See, e.g., United States v. Porter, No. 2:18-CR-155-LSC-WC, 2018 WL 4214189, at *12 (M.D. Ala. Aug. 9, 2018), report and recommendation adopted, No. 2:18-CR-155-LSC-WC, 2018 WL 4088052 (M.D. Ala. Aug. 27, 2018) (recommending denial of motion to suppress where defendant did not identify the statements to be suppressed or provide other information about them such

---

[3] The video evidence submitted by the Government shows Sgt. Warren asking Defendant, "You wanna tell me what else is in [the car] before I find it?" Gov't's Ex. 8 at 3:07:02.

[4] Defendant does not challenge the statement to his girlfriend which was overheard by Sgt. Warren and Deputy Turpin or Defendant's statement to Agent Gage.

[5] At approximately 3:32:08, Defendant got Sgt. Warren's attention and told him there was a "gauge" in the vehicle, but this statement was not in response to a question. (53.) When Sgt. Warren relayed this information to Deputy Turpin, Deputy Turpin replied the firearm had already been located. (54.)

16

as their contents and when and where they were made); United States v. Edwards, 563 F. Supp. 2d 977, 994 (D. Minn. 2008), aff'd sub nom. United States v. Bowie, 618 F.3d 802 (8th Cir. 2010) ("At the end of the day, as the moving party, at a minimum it is defendant's burden to come forth with some evidence and argument to support his position that evidence, statements or a witness identification should be suppressed.").

### D. Suppression

Finally, Defendant argues that all of the evidence seized following the alleged constitutional violations should be suppressed as fruit of the poisonous tree. Def.'s Mem. (Doc. 9) at 7-8.

Here, as discussed above, Defendant's constitutional rights were not violated with regard to the traffic stop or the vehicle search; the stop was reasonable and the search of the vehicle was supported by probable cause. As for Defendant's Miranda argument, even if it is assumed that Sgt. Warren's questions to Defendant while he was in custody were improper, no statements allegedly made by Defendant in response to those questions have been sufficiently identified so that suppression may be considered.

17

## V. Recommendation

Based on the foregoing, the undersigned respectfully RECOMMENDS that Defendant's Motion to Suppress (Doc. 8) be DENIED.

Signed: July 5, 2019

W. Carleton Metcalf
United States Magistrate Judge

## Time for Objections

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636(b)(1)(C), and Federal Rule of Civil Procedure 72(b)(2), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the presiding District Judge will preclude the parties from raising such objections on appeal. See Thomas v. Arn, 474 U.S. 140, 140 (1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).